# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| MITCHELL MARBURY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:04-CV-428-RDP-RRA |
| | ) | |
| EARL PICKETT, Sgt., et.al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF OPINION

## I.    INTRODUCTION

Mitchell Marbury, hereinafter referred to as Plaintiff, has filed a *pro se* amended complaint pursuant to 42 U.S.C. § 1983 alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States have been abridged during his incarceration at the St. Clair Correctional Facility in Springville, Alabama.  Plaintiff asserts claims against the following fourteen Defendants:   Lieutenant D. Bracknell;  Deputy Warden Archie Garrett;  Warden Ralph Hooks; Sergeant Samuel Howard; Corrections Officer C. Hunter; Sergeant Gary Malone; Nurse McDaniel; Corrections Officer R. Moore; Corrections Officer Shirley Nunn; Sergeant Earl Pickett; Corrections Officer T. Poe; Lieutenant Patrice Richie; Captain R. Simmons; and Corrections Officer C. Wallace. Plaintiff has demanded a jury trial, requests that judgment be entered in his favor, and seeks monetary relief.

The magistrate judge entered an Order for Special Report (Doc. #10) directing that copies of the amended complaint in this action be forwarded to all Defendants and requesting that they file a special report addressing the factual allegations contained in Plaintiff's amended complaint. Defendants were advised that the special report could be submitted under oath or accompanied by

affidavits and, if appropriate, would be considered as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  By the same Order, Plaintiff was advised that after he received a copy of the special report submitted by Defendants, he should file counter affidavits if he wished to rebut the matters presented by Defendants in the special report.  Plaintiff was further advised that such affidavits should be filed within twenty days after receiving a copy of Defendants' special report.

On August 19, 2004 and October 8, 2004, the Department of Corrections' Defendants filed special reports accompanied by their affidavits and pertinent documents.  (Docs. #19, 29).  Plaintiff filed responses thereto.  (Docs. #20, 31).  The Order for Special Report sent to Defendant McDaniel was returned by the U.S. Postal Service as undeliverable, and after some limited discovery, was mailed to Defendant McDaniel at a current address.  (Docs. #21, 22, 28, 30).  Thereafter, Defendant McDaniel filed an affidavit and special report.  (Docs. #32, 37).

Plaintiff was thereafter notified that Defendants' special reports would be construed as motions for summary judgment (Docs. #19, 29, 37), and that he would have twenty days to respond to the motions for summary judgment, including filing affidavits, or other material.  (Doc. #38). Plaintiff was advised of the consequences of any default or failure to comply with FED. R. CIV. P. 56.  (*Id.*)  *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  Plaintiff filed a response[1] and supplemental response.  (Docs. #39, 41).

---

[1]  In this response (Doc. #39), Plaintiff, for the first time, refers to NaphCare, Inc. as a named defendant.  NaphCare, Inc., has never been identified as a defendant, nor has Plaintiff requested permission to amend his complaint in order to do so.  Thus, any purported claims against NaphCare, Inc., shall not be considered.

2

## II.    SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  In assessing a summary judgment motion, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been met, however, if the non-moving party bears the ultimate burden of persuasion, he may not merely rest upon his pleadings, but must come forward with substantial evidence supporting each essential element of his claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff is able to make such a showing, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990), *cert. denied*, 498 U.S. 1103 (1991).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted).  However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment.  *See Perry v. Thompson*, 786 F.2d 1093 (11th Cir. 1986).

## III.    SUMMARY JUDGMENT FACTS[2]

The following factual allegations are undisputed, or if disputed,[3] are construed in a light most favorable to Plaintiff.  On October 14, 2003, Plaintiff was informed by Warden Garrett that if he would get a hair cut, the Warden would remove him from restriction.  (Exhibit E to Doc. #29, at 1).[4] Plaintiff was in the process of going to the barbershop to accomplish this task when he was stopped by Defendant Wallace.  (*Id*. at 2).  Plaintiff claims he tried to explain that he was walking to the barbershop, but Wallace[5] called him a homosexual motherf–ker.  (*Id*. at 2-3).  Plaintiff admits that he thereafter told Wallace that he would sue her, and used sexually explicit language toward Wallace.  (*Id*. at 2).

---

[2]  The court views the evidence, and all factual inferences arising from it, in the light most favorable to Plaintiff, the nonmoving party.

[3]  Any factual disputes related to a particular defendant shall be addressed in footnote form at the appropriate time.

[4]  After the Order for Special Report was entered, the Department of Corrections opened an internal investigation with regard to the allegations in the complaint.  Plaintiff was interviewed by I&I investigators in June 2004, and Defendants produced a transcript of the interview.  (Exhibit E to Doc. #37).  Plaintiff does not take issue with the content of the transcript, which generally follows the allegations in the Amended Complaint.  The court notes that Defendants have *never* filed the written results of the I&I investigation.

[5]  Wallace denies verbally abusing Plaintiff while she was clearing the G-Gate/Gym area on October 14, 2003.  (Exhibit 25 to Doc. #19).  Instead, she contends Plaintiff became "loud and belligerent stating: 'I ain't no f–k boy!' 'I m sick of this s–t, f–k you, I'll show you how to stick this dick down your throat.'" Wallace then escorted Plaintiff to the Shift Commander's Office and "reported the incident to Sgt. Earl Pickett." *Id*.  She agrees with Defendant Pickett's version of events (which is reviewed in more detail below) with respect to what occurred thereafter.

Wallace instructed Plaintiff to leave the area, but Plaintiff asked Wallace to escort him to the Shift Commander's Office so that he could complain to Wallace's supervisor, Defendant Capt. R. Simmons, about Wallace's verbal abuse. (Doc. #9, at 9-10; Exhibit 1 to Doc. #20). At the Shift Commander's Office, Plaintiff attempted to speak to Simmons,[6] but Defendant Pickett informed Plaintiff he must resolve the issue with Wallace. (Doc. #9, at 10). Plaintiff claims that when he tried to explain the situation to Pickett, Pickett responded that he did not care about Plaintiff's lies, and said, "You are going to make me kick your ass boy. . . ." (*Id*.) Plaintiff claims that Pickett then walked to the Shift Commander's Office door and told all inmates standing in front of the Shift Commander's Office to "get the hell out . . ." (*Id*.) Plaintiff has proffered a diagram of the Shift Commander's Office (Exhibit 3 to Doc. #20), which depicts that all inner offices are directly connected and adjacent to the central office, which is where Plaintiff contends Defendant Pickett was located. (Doc. #9, at 10). He claims the attack occurred in the doorway of the Population Captain's office. (*Id*.)

Plaintiff contends that after shutting the Shift Commander's Office door, Pickett walked over to Plaintiff and sprayed Plaintiff in the face with mace, "grabbed Plaintiff around the neck, and ordered Plaintiff to get on his knees and submit to restraints." (Doc. #9, at 10). Plaintiff also claims that, after he was handcuffed, Pickett sprayed him a second time in the face, hit him on the back of his head with a closed fist, snatched him to his feet, led him from the Shift Commander's Office and "shoved Plaintiff into a wall face first." (*Id.* at 11). Three inmates – Montez McGowen, Tyrone

---

[6] Simmons does not deny this contention. He does attest that on October 14, 2003, he was located in an inner office known as the Population Captain's office with Lt. Bracknell when he heard a commotion in the outer office. (Exhibit 24 to Doc. #19, at 1-2). Simmons states it took fifteen to twenty seconds to get to the outer office, at which time Plaintiff was face down, being handcuffed and legcuffed by Pickett and Young. (*Id.*)

Moore, and John Ervin Cook – have filed affidavits claiming they witnessed this attack on Plaintiff.

(Exhibits 17, 19, 20 to Doc.

#20).  Plaintiff also asserts that Pickett[7] then took Plaintiff back into the Shift Commander's

Office, and maced Plaintiff a third time, while shoving one knee to Plaintiff's neck and back.  (Doc.

---

[7] Pickett denies threatening to kick Plaintiff's ass, maliciously pepper spraying Plaintiff, physically attacking Plaintiff, or violating any of Plaintiff's civil rights.  (Exhibit 21 to Doc. #19).  In his version of events, Pickett attests that Plaintiff was escorted to the Shift Commander's Office by Defendant Wallace because of his insubordinate behavior.  According to Pickett,

> [t]he Plaintiff appeared to be upset and angry.  I began questioning the Plaintiff concerning his actions.  The Plaintiff became belligerent and stated, "I don't have to take this shit!" and attempted to pick up a chair.  In order to prevent the Plaintiff from hurting Officers Poe and Wallace who were also present in the office at that time or hurting himself or me I took hold of the Plaintiff's coat to pull him away from the chair.  The Plaintiff began struggling with me.  I managed to grab my can of Freeze t P, a chemical agent, and sprayed the Plaintiff. I ordered the Plaintiff to lay on the floor to be handcuffed.  I then handcuffed the Plaintiff with his hands behind his back.  The Plaintiff began yelling, "I need some water, I need some water, I can't breathe!"  The Plaintiff jumped up from the floor and began kicking and struggling.  I again took hold of the Plaintiff and he advanced toward me and I pulled the Plaintiff off balance causing the Plaintiff to hit his face area on the wall.  It should be noted that it was unintentional on my behalf that the Plaintiff's face hit the wall; my goal was to gain control of the situation to insure no one including the Plaintiff was hurt.  The Plaintiff was totally out of control and continued to resist.  I then instructed Officer Young to get a pair of leg irons from the Captain's Office.  Officer Young placed the legs irons on [the] Plaintiff.  Officer Randy Harp and Officer Young escorted the Plaintiff to the infirmary to be examined.  The Plaintiff had blood on the side of his face and mouth with a laceration inside his right lip and his top tooth loose.  I received a scratch on my right forearm and blood from the Plaintiff.  Lt. David Bracknell filled out a first injury report and blood/body fluid exposure report. . . . .

(*Id.*)

6

#9, at 11).  Plaintiff has attested that he did not resist or provoke such an attack and that Defendants

Richie,[8] Wallace,[9] and Poe[10] were present, but did not come to his aid.  (*Id.*)

Plaintiff also states that Defendants Bracknell[11] and Simmons[12] were also present, but did nothing

to stop Pickett and/or assist Plaintiff.[13]  (Doc. #9, at 11).

---

[8]  Richie does not deny this in her affidavit.  (Exhibit 23 to Doc. #19, at 1-2).

[9]  Wallace supports Defendant Pickett's version of events.  (Exhibit 25 to Doc. #19).

[10]  Poe states that he saw Wallace and Plaintiff enter the Shift Office, where Wallace reported that Plaintiff had been insubordinate.  (Exhibit 22 to Doc. #19).  Pickett questioned Plaintiff about the incident, and Plaintiff became loud and angry.  Upon noticing other inmates gathering around the Shift Office door, Poe motioned them away and shut the door.  When he turned back around, he saw Plaintiff "reach behind him to grab a chair."  (*See generally* Exhibit 22 to Doc. #19).  Poe attests that Pickett pulled Plaintiff away from the chair and pepper sprayed Plaintiff.  Plaintiff broke away from Pickett and ran toward the door.  Poe put his hand to Plaintiff's chest, ordered him to stop, and lie down to be handcuffed.  Poe then called for two rovers, and responded to Plaintiff's complaints that he could not breathe by telling him that there were rovers in en route to take him to the infirmary.  Poe opened the office door to allow fresh air.  Plaintiff jumped up and a few seconds later, Poe witnessed Plaintiff run from the office, while Pickett held on to the door frame and the back of Plaintiff's clothes trying to stop him.  Plaintiff stated he could not breathe, broke away from Pickett and hit the wall.  Poe attests that at no time did Pickett abuse the Plaintiff in any way.  (*Id.*)

[11]  Bracknell attests that he was not present when Defendant Pickett allegedly assaulted Plaintiff.  (Exhibit 15 to Doc. #19).  Bracknell states that

> Captain Simmons and I were in his office along with Lt. Patrice Richie.  A commotion occurred in the shift office and I smelled the Freeze t P.  At that time I went to the door of the shift office as Sgt. Pickett was trying to grab the Plaintiff as he ran out in the hallway.  I started to the door as Sgt. Pickett re-entered the shift office and at that time Sgt. Pickett and the Plaintiff were struggling and Sgt. Pickett took the Plaintiff to the floor.  At no time did I witness any unnecessary force used in the Population.

(*Id.*)

[12]  Simmons attests it took fifteen to twenty seconds to get to the outer office, at which time Plaintiff was face down, being handcuffed and legcuffed by Pickett and Young.  (Exhibit 24 to Doc. #19).  Simmons noticed Plaintiff was bleeding about his mouth.  Plaintiff was very upset, crying, and threatening to call his family.  Plaintiff was then escorted to the infirmary.  Simmons did smell pepper spray upon entering the outer office.  He states he saw nothing which led him to believe it was necessary to intervene in order to protect Plaintiff.  (*Id.*)

[13]  In two affidavits filed in response to the special report submitted by Defendants Bracknell and Poe, Plaintiff uses the terminology "negligent," when declaring these officers failed to intervene on

Plaintiff was escorted to the prison infirmary at 10:25 a.m., where he was treated.  (Doc. #9, at 11; Exhibit 8 to Doc. #19).  Nurse Barbee reports that "[i]nmate Marbury had been sprayed in his face with mace, there was blood on the side of his face, an in mouth laceration and a loose top tooth. Inmate Marbury's mouth was rinsed with water and [he was] sent to the dental clinic for referral per the Dentist for his tooth."  (Exhibit 13 to Doc. #19, at 1-2).  The order of the on-call physician, Dr. Corder, shows that Plaintiff was given a dental referral, an ice bag to his lip, eye irrigation, and a prescription for Benadryl and Motrin.  (Exhibit 26 to Doc. #19, at 2).

After Plaintiff was treated and released from the prison infirmary, he was escorted to segregation.  (Doc. #9, at 11).  Once in the shift office of the segregation unit, he claims that the following occurred.  Defendant Howard directed him to get on his knees "to exchange population restraints for segregation restraints."  (*Id.*)  While Plaintiff was on his knees, Defendant Howard said, "Don't f--king look at me like you are mad."  (*Id.* at 12).  Plaintiff responded, "You would be mad too, if a motherf–ker was beating on you for nothing."  (*Id.*)  While Plaintiff was on his knees, in restraints, and passive, Defendant Howard[14] hit Plaintiff in the face three times.  (*Id.*)  Defendants

_____

Plaintiff's behalf during the assaults.  (Exhibits 9 & 10 to Doc. #20).  To the extent Plaintiff alleges that Bracknell and Poe failed to intervene in violation of his Eighth Amendment constitutional rights, the affidavits shall be considered.  However, to the extent Plaintiff is attempting for the first time to allege a negligence claim against those Defendants, his assertions are immaterial to the claims before the court. Plaintiff has not previously raised any claim of negligence against Bracknell and Poe.

[14] Defendant Howard admits he was in the Segregation Unit on October 14, 2003, but denies he beat or touched Plaintiff in any way.  (Exhibit 16 to Doc. #19).

8

Richie[15] and Hunter[16] were present but did nothing to stop Howard and assist Plaintiff.  (*Id.*)  Plaintiff suffered a substantial amount of pain because of the swelling and bruises to his face.  (*Id.*)  After the assault, Plaintiff requested medical care from Defendants Richie, Howard and Hunter, but was denied same.  (*Id.*)  In fact, Defendant Richie stated, "You little bitch . . . [Y]ou better not say s--t to anyone about this[. I]f you do I'll have your ass beat again."  (*Id.*)

While Howard was escorting Plaintiff to the property room for processing, Plaintiff informed Defendant Howard that he intended to pursue legal action against him.  (*Id.*)  In response, Defendant Howard[17] attacked Plaintiff again, grabbing him by the neck, slamming him into a wooden counter, and striking him in the face eight or nine times with a closed fist.  (*Id.* at 13).  During this assault, Plaintiff also asserts that Defendants Malone,[18] Moore,[19] and Nunn[20] were present, but did nothing to stop Howard or assist Plaintiff.  (*Id.*)

---

[15]  Richie denies that Plaintiff was beaten by Defendant Howard during his transfer to the segregation unit, attests she never verbally spoke with Plaintiff, did not advise anyone to harm Plaintiff and asserts Plaintiff was never denied medical attention at any time.  (Exhibit 23 to Doc. #19).

[16]  Hunter attests she did not witness any assault and has no knowledge about Plaintiff's October 14, 2003 assault allegations.  (Exhibit 17 to Doc. #19).

[17]  Howard admits that he was in the Segregation Unit on October 14, 2003, but denies he beat or touched Plaintiff in any way.  (Exhibit 16 to Doc. #19).  He also denies escorting Plaintiff to the Segregation Unit, and instead asserts that he was already present in the unit when Plaintiff arrived.  (*Id.*)

[18]  Malone denies that he witnessed Plaintiff's assault and contends he has no knowledge of the incident.  (Exhibit 18 to Doc. #19).  Malone also denies that he refused Plaintiff medical treatment on October 14, 2003 and October 15, 2003.  (*Id.*)

[19]  Moore denies that he witnessed Plaintiff's assault and contends he has no knowledge of the incident.  (Exhibit 19 to Doc. #19).

[20]  Nunn denies that she witnessed Plaintiff's assault, contends she has no knowledge of the incident, and declares Plaintiff never asked for medical attention.  (Exhibit 20 to Doc. #19).

Inmate Delbert Tillery attests that he saw Sgt. Howard escort Plaintiff to the property room on October 14, 2003, and minutes later saw Officer Nunn exit the room with Plaintiff. (Exhibit 16 to Doc. #20). Plaintiff presents copies of his October 14, 2003 property and cell inspection sheet, certified by Defendant Nunn, to prove that Defendant Nunn is indeed aware of the assault and escorted him on that date. (Exhibit A-1 & A-2 to Doc. #41).

As a result of this beating, Plaintiff claims he suffered bleeding and swelling, and had to be given a new set of clothing in exchange for the bloody set he was wearing.[21] (Doc. #9, at 13). Plaintiff also asserts that he asked to be taken to the infirmary but Defendant Richie refused, even though Plaintiff's face was completely swollen.[22] (Doc. #9, at 13). According to Plaintiff, he again requested medical attention from Richie, Malone, Howard, Nunn, and Moore, but again his request was ignored.

Plaintiff was taken to his segregation cell. (*Id.* at 14). Inmate David Coffman was housed in segregation on October 14, 2003, and witnessed Plaintiff's swollen face as Plaintiff was escorted into the segregation unit by Officer Nunn. (Exhibit 18 to Doc. #20). Coffman stated he and some of the other inmates took it upon themselves to try to get Plaintiff some medical attention by asking Nurse Barbee to go see Plaintiff. (*Id.*)

---

[21]   Howard denies that Plaintiff was given new clothing due to bleeding, and instead asserts that Plaintiff was afforded new clothing because he had pepper spray on his clothes. (Exhibit 16 to Doc. #19). Howard denies that he later told Nurse Barbee he would not take Plaintiff to the infirmary and states that he never talked to any nurse regarding Plaintiff's condition.

[22]   Richie claims that she did not see anything, and therefore was not in a position to help Plaintiff. (Exhibit 23 to Doc. #19).

During pill call, Plaintiff told Nurse Barbee[23] he needed medical attention. (Doc. #9, at 14). Barbee observed Plaintiff's injuries, and informed Plaintiff she would do everything she could to get Plaintiff medical attention. (*Id.*) However, security staff refused to allow Plaintiff to be taken to the health care unit. (*Id.*) On October 14, 2003 and October 15, 2003, Plaintiff submitted NaphCare Health Care service requests, but was not seen by any medical staff. (*Id.*; Exhibit 6 to Doc. #20, at 2). On October 15, 2003, inmate Tillery was waiting in the hallway when he and other inmates noticed that Plaintiff's eyes were swollen shut, and his face and ears were swollen. (Exhibit 16 to Doc. #20). Tillery and other inmates asked the officers to take Plaintiff to the infirmary, but their request was denied. (*Id.*)

Barbee confirms that on October 15, 2003, she:

> conducted the morning segregation pill call. Officer Anthony Mostella was my escort. Upon arrival to H-1 C/D cellblock inmate Marbury called me over to his cell. He stated to me that he needed medical attention. I immediately noticed he looked much worse on this day the 15th of October 2003 than he did on the 14th of October 2003. It was shocking to me that mace would effect someone in that way. His eyes were badly swollen and his face was swollen. I then advised Officer Mostella that the inmate needed to come to the Infirmary. To my knowledge inmate Marbury was not escorted to the Infirmary on October 15th.

(Exhibit 13 to Doc. #19). Plaintiff contends Barbee advised him that she had tried to get medical assistance for him, but Defendants Richie, Malone and Howard refused to allow Plaintiff to be taken to the infirmary. (Doc. #9, at 14).

On October 16, 2003, Plaintiff spoke to Nurse Price about getting medical attention but was told that a corrections officer would not allow it. (*Id.* at 15). On the same date, he told Nurse

---

[23] Plaintiff incorrectly spells Nurse Barbee's surname as Barber.

Black[24] he needed medical attention.  (*Id.*)  Black observed Plaintiff's injuries, and informed the officer escorting her that Plaintiff needed medical attention.  (*Id.*)  Nurse Black confirms that on October 16, 2003, Plaintiff called her over to his segregation cell.  (Exhibit 14 to Doc. #19).  Black attests:

> [i]nmate Marbury stated, "Ms. Black come look at this, my head hurts."  I noticed that inmate Marbury's forehead was swollen, but mainly over his right eye.  There also appeared to be a knot over his right eye.  His appearance scared me.  At that time I advised the Officer that was with me that the inmate needed to be seen by someone.

(*Id.*)

Plaintiff was then released to the health care unit.  (Doc. #9, at 14).  Inmate Coffman confirms that although he and other inmates had asked officers to seek medical attention for Plaintiff during their October 15, 2005 morning walk, it was not until late Thursday, October 16, 2003 when Officer Conner and Nurse Black took Plaintiff to the infirmary.  (Exhibit 18 to Doc. #20).  Inmate Coffman has attested that he "witness[ed] [Plaintiff], right eye completely shut closed, left eye half shut, lip swollen, jaw swollen and ear, I mean it was one horrible sight."  (*Id.*)

Upon arriving at the health care unit,  Nurse McDaniel told Plaintiff that he could not help Plaintiff because he had already been treated on October 14, 2003.  (Doc. #9, at 15).  Plaintiff explained that he had been beaten after his visit to the health care unit, but McDaniel[25] refused to treat Plaintiff, and he was sent back to segregation.  (*Id.*).

---

[24]  Plaintiff incorrectly spells Nurse Black's surname as Block.

[25]  On October 4, 2004, McDaniel came to St. Clair Correctional Facility to be interviewed by Pete Holtam, an investigator for I&I.  (Exhibit A to Doc. #37; Doc. #32, at 3-4).  McDaniel states that he looked at pictures of Plaintiff and denies ever seeing Plaintiff at the St. Clair Correctional Facility.  (*Id.*)  He also reviewed medical charts for October 15, 2003 and October 17, 2003, but attests he cannot remember anything about them, the incident, or Plaintiff.  (*Id.*)

On October 17, 2003, Plaintiff was again taken to the infirmary, and he received treatment for his injuries, a second body chart and prescribed medication. (Doc. #9, at 15). Plaintiff also states that he was scheduled to be seen twice a day, and be seen by a physician, and was to have x-rays performed. (*Id.*) Nurse Barbee confirms this assertion, and attests:

> On October 17, 2003, I conducted segregation pill call. Officer Jerry Puckett was my escort. Upon arrival to H-1 C/D inmate Marbury against advised me that he needed medical attention. I went to his cell and looked at him and noticed . . . one of his eyes was swollen shut, and the other eye was nearly swollen shut and the one side of his face was swollen. I advised Officer Puckett that inmate Marbury needed medical attention. Later that afternoon Officer Laoulefiso Jones called me and requested I redo Plaintiff's body chart. Officer Jones stated that the first . . . body chart I completed on October 14, 2003 was incorrect. I told officer Jones to go ahead and escort inmate Marbury to the Infirmary. I know that was the only way I could get inmate Marbury to the Infirmary to be checked out. Officer Jones along with another Officer escorted inmate Marbury to the infirmary. I examined inmate Marbury. Inmate Marbury's right eye was swollen shut, and his left eye was swollen and nearly shut, the right side of his face was swollen, his right eye was draining badly and his right ear was swollen. For treatment I recommended the right side of his face be x-rayed, warm compresses for 5 days and Motrin 800 for 5 days for the inmate to see the Dr. ASAP.

> Later on that afternoon when Nurse McDaniels [*sic*] came in for work in second shift he stated to me that on October 16, 2003, DOC called and requested that he redo the body chart that I had completed on the 14th of October. Nurse McDaniels [*sic*] advised me that when DOC escorted inmate Marbury to the Infirmary he refused to redo the body chart that was completed by me. He told me that he advised DOC that I would have to redo my work.

(Exhibit 12 & 13 to Doc. #19).[26]

---

[26] McDaniel attests he reviewed Barbee's statement, but denies that he had any discussion with Barbee or that any corrections officials ever told him to change a patient's chart. (Exhibit A to Doc. #27). McDaniel additionally reviewed Nurse Black's written statement, but again attests he cannot remember anything about Plaintiff. (Exhibit A to Doc. #27). Nurse McDaniel asserts that because the phrase "Refused Screening" is written beside Plaintiff's October 17, 2003 request for health services, that Plaintiff refused to be treated. (*Id.*) McDaniel is without any personal knowledge to make such a conclusion, and accordingly, this portion of his affidavit will not be considered.

On October 20, 2003, Plaintiff's face was x-rayed by Dr. Lawrence. (Exhibit E to Doc. #37, at 29). Unbeknownst to Plaintiff, it revealed no fractures. (*Id.*; Exhibit F to Doc. #29, at 38). As Plaintiff was leaving St. Clair on the same date, he passed Warden Garrett coming into the building. (Exhibit E to Doc. #37, at 29). Plaintiff attests he "questioned [Garrett[27]] about the incident and he told me to bring it to his attention in the board meeting Wednesday. But as I got back over to the seg[regation] unit, I was told that I was being awaited at the back gate to be taken back to Talladega for court." (*Id.*) Plaintiff claims he remained at Talladega County Jail from October 20, 2003 to November 18, 2003. (*Id.*)

Upon his return to St. Clair, Plaintiff "wrote Warden Hooks a letter explaining the situation that I felt needed to be investigated. And uh, I turned around and I wrote Garrett, Warden Garrett explaining the situation I felt needed to be investigated. And I never got a reply." (*Id.* at 30). Plaintiff also has submitted copies of the letters he claims to have sent to Hooks[28] and Garrett. (Exhibit 4 & 5 to Doc. #20). In the letters, Plaintiff complained that it was unfair for him to be given two disciplinary infractions arising from the October 14, 2003 incidents (insubordination as to

---

[27]   Warden Garrett admits that he serves as a member of the weekly segregation review board. (Exhibit 2 to Doc. #19). However, Garrett denies Plaintiff's allegations against him, and denies Plaintiff ever complained of excessive force being used against him during the segregation board meetings in October 2003. (*Id.*) Garrett attests he was not even aware of Plaintiff's allegations of excessive force until the present lawsuit was filed. (*Id.*) At that time, Garrett referred the matter to the Alabama Department of Corrections I & I Division for investigation. (*Id.*) The remainder of Garrett's affidavit is: (1) a recitation of the Defendant Pickett's version of events (none of which is within the scope of Garrett's personal knowledge); and (2) a proffer of affirmative support for Defendant Howard and the manner in which he conducted the disciplinary hearings against Plaintiff (which is based solely on Garrett's review of the information contained in the disciplinary reports).

[28]   Although Warden Hooks has responded that he had Plaintiff's allegations investigated by Captain Robert Simmons, but does not state when this occurred or what the results of the investigation revealed. The remainder of his affidavit is recitation of the Defendant Pickett's version of events (none of which is within the realm of Hooks' personal knowledge). (Exhibit 1 to Doc. #19).

Defendant Wallace, and creating a security risk as to Defendant Pickett by attempting to grab a chair), and also claimed it was unfair for a disciplinary hearing to be scheduled on October 18, 2003, when Plaintiff was still severely injured. (*Id.*; Exhibits 10 & 11 to Doc. #19). Moreover, Plaintiff complained that it was unfair to assign Defendant Howard as the hearing officer regarding the disciplinary infractions as Howard actually participated in the assault. (*Id.*) Finally, Plaintiff demanded an investigation. (*Id.*)

On November 22, 2003 and December 15, 2003, Plaintiff filed a medical grievance and complaint in which he claimed that the October 14, 2003 and October 15, 2003 medical request slips had not been placed in his medical folder as required. (Doc. #31). He has attested that he never refused to be screened or receive medical assistance between October 16, 2003 and October 18, 2003. (*Id.*)

Plaintiff received no response from his complaints to Hooks and Garrett and claims that no investigation or disciplinary action was taken against the offending officers. (Doc. #9, at 16). He also asserts that Defendants Hooks and Garrett were aware of a history of repeated, widespread inmate abuse by the offending officers by way of "numerous lawsuits[,] internal investigations[,] and independent investigations of the prison[] and its staff."[29] (*Id.*; Doc. #20, at 5). Plaintiff contends Defendants Hooks and Garrett failed to investigate Plaintiff's assault or take any remedial action

---

[29] Plaintiff also has presented copies of three letters purportedly written in 2002 by inmates who complain about officer-on-inmate violence at the St. Clair Correctional Facility. (Doc. #20, Exhibit 6, at 6-11). Two of these letters are directed to a private attorney and one is directed to an unknown party. (*Id.*) Additionally, Plaintiff attaches a 2002 affidavit from inmate Nicholas Smith, who attests that Officer McMillian attacked him without reason. (*Id.* at 12). Finally, Plaintiff presents an original letter sent from inmate Marcus Lipsey to Warden Hooks and Deputy Garrett, in which Mr. Lipsey complains that inmate Kevin Manning was attacked by Officer Norman and, on behalf of Manning, demands an investigation. (*Id.* at 13). None of the letters pertain to the Defendants in this case. However, elsewhere in his response, Plaintiff contends that he can prove the systemic officer abuse if he is allowed to conduct additional discovery.

until over eight months after the incident occurred and then only after the present lawsuit was filed. (Doc. #9, at 16).

Plaintiff contends the foregoing actions of Defendants in their individual and official capacities violated his First, Fourth, Eighth and Fourteenth Amendment rights to the United States Constitution. (*Id.*) Specifically, Plaintiff claims he was subjected to excessive force, that no one intervened to help him, that he was denied medical care, and that supervisory Defendants were aware of this type of pattern of violent conduct and abuse by certain Defendants, but did nothing to remedy the situation. (*Id.* at 16-18).

## IV.    ANALYSIS

### A.    <u>DEFENDANTS' LEGAL DEFENSES</u>[30]

Those Defendants who work with the Department of Corrections assert they are entitled to absolute, qualified, discretionary function and/or state agency immunity, and also contend Plaintiff has failed to state a claim upon which relief may be granted, has improperly predicated his claims upon *respondeat superior*, and that Plaintiff's injuries were *de minimis*. (Doc. #19, at 14-15).

The defenses presented by Defendant McDaniel that bear mentioning here are that he is entitled to absolute, qualified, discretionary function and state agency immunity, and that Plaintiff has failed to state a claim upon which relief may be granted. (Doc. #37, at 1-2).

---

[30] The relevant factual allegations proffered in support of these legal defenses have been referenced in various footnotes within the "Factual Allegations" portion of this Memorandum of Opinion.

16

### B.   PLAINTIFF'S FIRST, FOURTH AND FOURTEENTH AMENDMENT CLAIMS

Plaintiff contends Defendants' actions violated his rights under the First and Fourth Amendments.  However, Plaintiff fails to present any legal basis for this conclusory assertion, and there is no apparent connection between the actions of Defendants and First and Fourth Amendment jurisprudence.   Accordingly, Defendants are entitled to judgment as a matter of law and their motions for summary judgment as to these claims are due to be granted.

Plaintiff also alleges that his rights under the Fourteenth Amendment were violated by Defendants.  A liberal review of the record and Plaintiff's arguments suggests that he is asserting a substantive due process claim under the Fourteenth Amendment.  However, such a claim is subsumed by his claims under the Eighth Amendment.  As the Supreme Court has stated:

> As an alternative ground for affirmance, respondent contends that, independently of the Eighth Amendment, the shooting deprived him of a protected liberty interest without due process of law, in violation of the Fourteenth Amendment. . . . Respondent correctly observes that any ground properly raised below may be urged as a basis for affirmance of the Court of Appeals' decision, *see United States v. New York Telephone Co.*, 434 U.S. 159, 166, n. 8, 98 S. Ct. 364, 369, n. 8, 54 L. Ed. 2d 376 (1977), and argues that he has maintained throughout this litigation that his "constitutional protection against the use of excessive and unnecessary force, as well as the use of deadly force without meaningful warning," derives from the Due Process Clause as well as the Eighth Amendment. Brief for Respondent 25, n. 13.
>
>          . . . .
>
> We need say little on this score.  We think the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified.  It would indeed be surprising if, in the context of forceful prison security measures, "conduct that shocks the conscience" or "afford[s] brutality the cloak of law," and so violates the Fourteenth Amendment, *Rochin v. California*, 342 U.S. 165, 172, 173, 72 S. Ct. 205, 210, 96 L. Ed. 183 (1952), were not also punishment "inconsistent with contemporary standards of decency" and "'repugnant

17

> to the conscience of mankind,'" *Estelle v. Gamble*, 429 U.S., at 103, 106, 97 S. Ct.,
> at 290, 292, in violation of the Eighth.  We only recently reserved the general
> question "whether something less than intentional conduct, such as recklessness or
> 'gross negligence,' is enough to trigger the protections of the Due Process Clause."
> *Daniels v. Williams*, 474 U.S. 327, 334, n. 3, 106 S. Ct. 662, 667, n. 3, 88 L. Ed. 2d
> 662 (1986).  Because this case involves prison inmates rather than pretrial detainees
> or persons enjoying unrestricted liberty we imply nothing as to the proper answer to
> that question outside the prison security context by holding, as we do, that in these
> circumstances the Due Process Clause affords respondent no greater protection than
> does the Cruel and Unusual Punishments Clause.

*Whitley v. Albers*, 475 U.S. 312, 326-27 (1986); *see also Graham v. Connor*, 490 U.S. 386, 395

(1989) ("Any protection . . . substantive due process affords convicted prisoners against excessive

force is  . . . at best redundant of that provided by the Eighth Amendment").  Because Plaintiff's due

process claim is subsumed by his Eighth Amendment claim, the latter is due to be dismissed.

### C.   PLAINTIFF'S CLAIMS AGAINST THE STATE ACTOR DEFENDANTS IN THEIR OFFICIAL CAPACITIES

To the extent Plaintiff requests monetary damages for the constitutional claims alleged

against Defendants in their official capacity, Defendants' motion for summary judgment is due to

be granted.  It is well settled that the Eleventh Amendment bars § 1983 claims for monetary damages

in federal court against the state or an agency of the state.  *Alabama v. Pugh*, 438 U.S. 781 (1978);

*see also Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984).  As the Supreme

Court in stated in *Pugh*:

> [T]here can be no doubt . . . that suit against the State and its Board of Corrections
> is barred by the Eleventh Amendment, unless Alabama has consented to the filing of
> such a suit. *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Department
> of Treasury*, 323 U.S. 459 (1945); *Worcester County Trust Co. v. Riley*, 302 U.S. 292
> (1937).  Respondents do not contend that Alabama has consented to this suit, and it
> appears that no consent could be given under Art. I, sec. 14, of the Alabama

Constitution, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity."

438 U.S. at 782. "Absent a legitimate abrogation of immunity by Congress or a waiver of immunity by the state being sued, the Eleventh Amendment is an absolute bar to suit by an individual against a state or its agencies in federal court." *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *see also Gamble v. Florida Dept. of Health & Rehabilitative Services*, 779 F.2d 1509, 1511 (11th Cir. 1986). Accordingly, the motions for summary judgment filed by all Defendants in their official capacities are due to be granted as a matter of law. The remainder of this Memorandum of Opinion will address Plaintiff's claims against Defendants in their individual capacities.

### D.   NURSE MCDANIEL'S CLAIM OF QUALIFIED IMMUNITY

Nurse McDaniel argues that he is entitled to qualified immunity, state agent immunity, and discretionary function immunity. However, as a nurse employed by a private contractor to provide health care to Alabama inmates, McDaniel is not eligible to assert these affirmative defenses. *Hinson v. Edmond,* 192 F.3d 1342 (11th Cir. 1999). Therefore, McDaniel cannot advance the defense of qualified immunity and his motion for summary judgment is due to be denied as a matter of law.

### E.   PLAINTIFF'S EIGHTH AMENDMENT EXCESSIVE FORCE CLAIM AND DEFENDANTS' ASSERTION OF QUALIFIED IMMUNITY

Defendants also assert the affirmative defense of qualified immunity in connection with Plaintiff's claims of excessive force. However, "[i]n this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution . . . . There is simply no room for a qualified immunity defense when the plaintiff

alleges such a violation. . . .   The only question, then, is whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or motion for summary judgment.  If he has done so, that is the end of the inquiry." *Skrtich v Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002), *citing Johnson. v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002) (*quoting Whitley v. Albers,* 475 U.S. at 320-21, and *Hudson v. McMillan*, 502 U.S. 1, 8 (1992)).  As qualified immunity is not at issue, the court will address whether Plaintiff has otherwise alleged sufficient facts to survive Defendants' motions for summary judgment.

Eighth Amendment excessive force claims are analyzed under the standards set forth by the Supreme Court in *Whitley v. Albers*, 475 U.S. 312 (1986) and *Hudson v. McMillan*, 503 U.S. 1 (1992).  *See Campbell v. Sikes,* 169 F.3d 1353, 1374 (11th Cir. 1999).  In *Hudson*, the Court held that in assessing an inmate's excessive force claim, "the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillan*, 503 U.S. at 6-7.  In *Hudson*, the court extended *Whitley* to all cases involving allegations of the use of force by prison officials and reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order.  Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates.  Both situations may require prison officials to act quickly and decisively.  Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson v. McMillian*, 503 U.S. at 6 (citations omitted).  With these concerns in mind, the Court set out certain factors that should be considered in evaluating whether the force used was excessive,

including:  (1) the need for application of force; (2) the relationship between that need and the

amount of force used; (3) the threat "reasonably perceived by the responsible officials;" (4) any

efforts made to temper the severity of a forceful response; and (5) the extent of the injury suffered

by the inmate.  *Id*. at 7; *see also H.C. v. Jarrard*, 786 F.2d 1080, 1085 (11th Cir. 1986).

In applying these factors in a particular case, the Court has instructed that:

> not . . . every malevolent touch by a prison guard gives rise to a
> federal cause of action.  *See Johnson v. Glick*, 481 F.2d, at 1033
> ("Not every push or shove, even if it may later seem unnecessary in
> the peace of a judge's chambers, violates a prisoner's constitutional
> rights").  The Eighth Amendment's prohibition of "cruel and unusual"
> punishments necessarily excludes from constitutional recognition *de
> minimis* uses of physical force, provided that the use of force is not of
> a sort "'repugnant to the conscience of mankind.'"  *Whitley*, 475 U.S.,
> at 327, 106 S. Ct., at 1088 (quoting *Estelle, supra*, 429 U.S., at 106,
> 97 S. Ct., at 292) (internal quotation marks omitted).

*Hudson*, 503 U.S. at 9.

Viewing the facts in this case in the light most favorable to Plaintiff, Defendants Pickett,

Howard, and Richie (by way of her status as a supervising officer and personal involvement in the

assaults) intentionally and maliciously used force upon Plaintiff.  Further, no force against Plaintiff

was necessary because, based upon Plaintiff's version of the facts, he was passive and obedient when

the assaults occurred.[31]

---

[31] Defendants present various factual defenses including:  (1) lack of knowledge; (2) not being in
a position to witness the incidents; (3) the assaults did not occur; or (4) assertions that the force utilized
against Plaintiff was in response to his aggression, was not excessive, and was intended to bring security and
order to the situation.  None of these defenses are supported by Plaintiff's version of the facts which the court
must accept as true for purposes of these motions.  It is well established that at this stage, the court cannot
assess the credibility of Plaintiff or Defendants' allegations.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 255 (1986); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); *United States
v. Four Parcels of Real Property in Greene and Tuscaloosa Counties*, 941 F.2d 1428, 1437 (11th Cir. 1991);
*Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1425 (11th Cir. 1990).  The facts presented by
Plaintiff and Defendants are clearly in dispute.  Thus, the court finds there are genuine disputes between
Plaintiff and Defendants in connection with the following excessive force factors: (1) the need for application

Defendants also argue that Plaintiff has failed to state a claim because his injuries were *de minimis*.  This argument is wholly unsupported by the record.  Further, even if the injuries Plaintiff received from the first assault on his person by Defendant Pickett were arguably *de minimis*, Plaintiff's claims still survive Defendants' motion for summary judgment because the *de minimis* injuries received were the result of behavior "'repugnant to the conscience of mankind.'"  *Oliver v. Falla,* 258 F.3d 1277, 1282 (11th Cir. 2001) (citing *Hudson v. McMillian*, 503 U.S. at 9-10)).  For the foregoing reasons, the motions for summary judgment filed by Defendants Pickett, Howard and Richie are due to be denied as a matter of law.

### F.    PLAINTIFF'S EIGHTH AMENDMENT FAILURE TO PROTECT CLAIM

Plaintiff also alleges that Defendants Richie, Nunn, Wallace, Malone, Moore, Poe, Simmons, Hunter, Garrett and Hooks failed to protect him.  The Eighth Amendment's prohibition on cruel and unusual punishment imposes upon institutional officials the duty to "'take reasonable measures to guarantee the safety of the inmates'" in their custody.  *Farmer v. Brennan*, 511 U.S. at 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  It is clear, however, that not every injury suffered by an inmate "translates into constitutional liability for prison officials responsible for [the inmate's] safety."  *Farmer*, 511 U.S. at 834.  *Cf. Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986).  "In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some

_____

of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response.

allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to constitutional stature." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982), *quoting Wright v. El Paso County Jail*, 642 F.2d 134, 136 (5th Cir. 1981); *Gullatte v. Potts*, 654 F.2d 1007, 1012 (5th Cir. 1981) ("When officials are aware of a danger to an inmate's health and safety, however, as appears to be the case when an inmate cooperates with an official prison investigation, it does violate the constitutional proscription against cruel and unusual punishment to fail to afford that inmate reasonable protection."). It is only when institutional officials' deliberate indifference to a known danger or risk exposes an inmate to "objectively, 'sufficiently serious'" harm, that a constitutional violation occurs. *Farmer*, 511 U.S. at 834. *Cf. Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.) ("When officials become aware of a threat to an inmate's health and safety, the Eighth Amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection."), *cert. denied*, 496 U.S. 928 (1990).

A danger or risk is "known" only if the institutional official is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] th[at] inference." *Farmer*, 511 U.S. at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived, but did not," is not sufficient to establish liability on the part of the official. *Id*. at 838. Furthermore, "[t]he known risk of injury must be a 'strong likelihood, rather than a mere possibility.'" *Brown*, 894 F.2d at 1537 (*quoting Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989)).

Once it is established that an institutional official knew of a substantial danger or risk to an inmate, it must then be shown that the official was deliberately indifferent to that risk. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm

23

actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. Deliberate indifference, however, requires "a state of mind more blameworthy than negligence." *Id.* at 835. For instance, institutional officials are not liable for a negligent failure to protect a prisoner from attack by another inmate. *Brown*, 894 F.2d at 1537. *See also Davidson v. Cannon*, 474 U.S. 344, 347 (1986); *Stubbs v. Dudley*, 849 F.2d 83, 85 (2nd Cir. 1988).

Applying these well-settled legal principles to the Rule 56 record in this case, the court concludes that there is sufficient evidence for a jury to determine that Richie, Nunn, Wallace, Malone, Poe, Simmons, and Hunter violated Plaintiff's Eighth Amendment rights when they were deliberately indifferent to a known danger (*i.e.*, an assault) that he faced. That is, Plaintiff has presented sufficient evidence to allow a trier of fact, if it believes his version of the events, to determine that he was assaulted by Pickett, Howard, and/or Richie, and the other Defendants witnessed the assault and took no action to prevent him from being harmed. Thus, there exist genuine issues of material fact with respect to Plaintiff's failure to protect claims against Richie, Nunn, Wallace, Malone, Moore, Poe, Simmons, and Hunter.

Although Defendants Garrett and Hooks were not eyewitnesses to the assaults, Plaintiff contends that they are liable to him because as supervising officers, they were aware of common officer-on-inmate assaults due to numerous lawsuits against, and investigations of, prison staff. Defendants Garrett and Hooks do not specifically deny this contention in their motions for summary judgment. Further, the sequence of events (as described by Plaintiff, other inmates, and medical officials), the uniform manner in which Plaintiff was denied protection and health care and subjected to speedy disciplinary hearings outside of his presence, and the complete failure of Defendants

Garrett and Hooks to reveal the substance and conclusions of the Internal Investigation, support Plaintiff's contention that Garrett and Hooks were indeed aware of the type of ongoing corruption and violence exhibited by the remaining Defendants and ratified the same by denying or covering up the occurrence of such events.

### G.     STATE ACTOR DEFENDANTS' ASSERTION OF QUALIFIED IMMUNITY AS TO PLAINTIFF'S EIGHT AMENDMENT FAILURE TO PROTECT CLAIM

As the court has determined that Plaintiff's allegations, if true, establish constitutional violations on the part of Defendants Richie, Nunn, Wallace, Malone, Moore, Poe, Simmons, Hunter, Garrett, and Hooks, it must address the question of whether they violated clearly established law. The doctrine of qualified immunity shields government officials engaging in discretionary functions from damages unless their acts or decisions contravene clearly established constitutional or statutory rights of which a reasonable official should have knowledge. *See Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).   In the present case, all of the actions alleged by Plaintiff were clearly within the Defendants' discretionary functions. *See Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (finding that "discretionary authority" includes "all actions of a governmental official that (1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority'") (*quoting Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)).   Accordingly, the court must study whether "a reasonable official [in the position of Defendants and at the time of the alleged violation] would understand that what [t]he[y] [were] doing violate[d] [Plaintiff's constitutional] right[s]." *Anderson v. Creighton*, 483 U.S. 636, 641 (1987). To accomplish this examination "for qualified immunity purposes[,] . . . [the court must look to] decisions [governing the conduct at issue] [by] the U.S. Supreme Court, Eleventh Circuit Court of

25

Appeals, or the highest court of the state where the case arose." *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826-27 n.4 (11th Cir. 1997). Before a public official is subjected to suit, he must be on notice that his conduct is unlawful. *Hope* v. *Pelzer*, 536 U.S. 730, 731 (2002). While previous cases with materially similar facts can make officials aware of unlawful conduct,

> [t]h[e] [Supreme] Court's opinion in *United States v. Lanier*, 520 U.S. 259 . . . .[1997] . . ., makes clear that officials can be on notice that their conduct violates established law even in novel factual situations. Indeed, the Court expressly rejected a requirement that previous cases be "fundamentally similar." Accordingly, the salient question that the Eleventh Circuit should . . .ask[] . . . is whether the state of the law in [2003] gave [Defendants] fair warning that [failure to protect plaintiff] was unconstitutional. . . .

*Id.*

Construing the allegations in the light most favorable to Plaintiff, in 2003, Supreme Court and Eleventh Circuit precedent made clear that Defendants' failure to protect Plaintiff from assault was unconstitutional. Accordingly, Defendants Richie, Nunn, Wallace, Malone, Moore, Poe, Simmons, Hunter, Garrett and Hooks are not entitled to qualified immunity as to Plaintiff's claims, and their motions for summary judgment are due to be denied as a matter of law.

## H. PLAINTIFF'S EIGHTH AMENDMENT FAILURE TO PROVIDE FOR MEDICAL NEEDS CLAIM

The Supreme Court has held that it is only <u>deliberate indifference</u> to serious medical needs that is actionable under § 1983. *Estelle v. Gamble*, 429 U.S. 97 (1976). "In contrast, delay or even denial of medical treatment for superficial, non-serious physical conditions does not constitute an Eighth Amendment violation." *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d at 1187-88.

As the Eleventh Circuit held in *Howell v. Evans*, 922 F.2d 712 (11th Cir. 1991), *vacated*, 931 F.2d 711 (11th Cir. 1991), *reinstated by unpublished order* (June 24, 1991):

> The standard for deliberate indifference focuses on the failure to provide or allow proper treatment in the face of information which reasonably should compel action.  Such deliberate indifference is often manifest by a refusal to act when certain actions were or should have been known to be necessary, rather than simply a failure to act.

*Howell*, 922 F.2d at 720.  An official also acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay.  *See Hill*, 40 F.3d at 1186 (holding that "cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem"); *Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994).  Delay in access to medical treatment can violate the Eighth Amendment, *Estelle*, 429 U.S. at 104-05, particularly when such a delay is "tantamount to 'unnecessary and wanton infliction of pain,'" *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir. 1990).

A medical need is considered serious when delay results in "a lifelong handicap or permanent loss." *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).  To succeed, an inmate claiming an unconstitutional delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Hill,* 40 F.3d at 1188.  Further, whether the length of the delay establishes deliberate indifference "depends on the nature of the medical need and the reason for the delay." *Harris*, 21 F.3d at 393-94.  Therefore, in deciding whether a delay in medical treatment is actionable, the

court must review the facts in the context of the seriousness of the medical need, and consider whether the delay worsened the medical condition and the reason for delay.

The facts presented by Plaintiff related to his condition would permit a jury to find that Plaintiff had a serious medical need beginning October 14, 2003, and continuing thereafter, but that Defendants were deliberately indifferent to that need.  In fact, the court has received affidavit testimony (from both inmates and medical personnel) that would allow a trier of fact to determine that Plaintiff's physical appearance was so bad that it horrified others who saw him after the assault. It is Plaintiff's position (and apparently Defendants do not dispute) that it took three days for medical personnel to get any officer to take Plaintiff to the infirmary for his wounds.  Plaintiff also contends that during those three days, at least one member of the medical department refused to treat him, and that there were attempts to alter his medical record so there would be no evidence therein to the severity of Plaintiff's injuries.  Such behavior, if proven, would constitute deliberate indifference to Plaintiff's serious medical needs.  Accordingly, there is sufficient evidence for a jury to determine whether Defendants Richie, Nunn, Hunter, Howard, Malone, Moore and McDaniel violated Plaintiff's right to receive treatment for his serious medical needs.

As the court has determined that Plaintiff's allegations, if true, establish a constitutional violation, it must decide whether the Department of Corrections Defendants are entitled to qualified immunity.  In 2003, reasonable prison officials in positions such as these Defendants knew or should have known that denying inmates medical treatment for non-medical reasons was unlawful.  Binding Eleventh Circuit precedent in effect long before 2003 provided ample notice to Defendants that they could not deny or delay medical treatment to Plaintiff based on facts such as those presented by Plaintiff in this case. *Hill v. DeKalb Reg'l Youth Det. Ctr*, 40 F.3d 1176, 1190 n.6 (11th Cir. 1994)).

Accordingly, Defendants Richie, Nunn, Hunter, Howard, Malone and Moore are not entitled to qualified immunity or summary judgment in their favor as to Plaintiff's medical treatment claims.

## V.    CONCLUSION

Having carefully reviewed and considered all the materials in the file, it is the opinion of this court that there are no genuine issues of material fact with respect to Plaintiff's First, Fourth and Fourteenth Amendment claims against all Defendants.  Therefore, Defendants' motions for summary judgment are due to be granted as to these claims, and they are entitled to judgment in their favor as a matter of law as to these claims.  Also, the court finds that there are no genuine issues of material fact with respect to Plaintiff's claims against all Defendants in their official capacities.  Therefore, Defendants' motions for summary judgment are due to be granted, and Defendants, to the extent they are sued in their official capacities, are entitled to summary judgment in their favor as a matter of law.

It is the opinion of this court, however, that there are genuine issues of material fact with respect to the Eighth Amendment excessive force claims against Defendants Pickett, Richie and Howard.  Therefore, the motions for summary judgment filed by Defendants Pickett, Richie and Howard as to these claims are due to be denied.  Additionally, this court finds that there are genuine issues of material fact with respect to the Eighth Amendment failure to protect claims against Defendants Richie, Nunn, Wallace, Malone, Moore, Poe, Simmons, Hunter, Garrett and Hooks. Therefore, the motions for summary judgment filed by Defendants Richie, Nunn, Wallace, Malone, Moore, Poe, Simmons, Hunter, Garrett and Hooks as to the Eight Amendment failure to protect claims are due to be denied.  Finally, it is the opinion of this court that there are genuine issues of material fact with respect to the Eighth Amendment failure to provide medical care claims against

Defendants Richie, Nunn, Hunter, Howard, Malone, Moore and McDaniel.  Therefore, the motions for summary judgment filed by Defendants Richie, Nunn, Hunter, Howard, Malone, Moore and McDaniel as to the Eight Amendment failure to provide medical care claims are due to be denied. An appropriate order will be entered.

      **DONE** and **ORDERED** this _____15th_____ day of November, 2005.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

30